RENDERED: JULY 2, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0230-MR

KENTUCKY PUBLIC PENSIONS
AUTHORITY; COUNTY
EMPLOYEES RETIREMENT
SYSTEM; AND JOINT DISABILITY
APPEALS COMMITTEE OF
KENTUCKY RETIREMENT
SYSTEMS                                                                APPELLANTS


                        APPEAL FROM FRANKLIN CIRCUIT COURT
v.                      HONORABLE PHILLIP J. SHEPHERD, JUDGE
                        ACTION NO. 19-CI-00748


PATRICIA CONLIN                                                          APPELLEE


                                OPINION
                        REVERSING AND REMANDING

                            ** ** ** ** **

BEFORE: EASTON, KAREM, AND TAYLOR, JUDGES.

KAREM, JUDGE: Appellants Kentucky Public Pensions Authority ("KPPA"),

County Employees Retirement System, and Joint Disability Appeals Committee of

Kentucky Retirement Systems, appeal the Franklin Circuit Court's order reversing

KPPA's decision to deny Appellee Patricia Conlin's ("Patricia") application for

non-hazardous disability retirement benefits under Kentucky Revised Statute

("KRS") 61.600.  After reviewing the record and applicable law, we reverse and

remand.

## FACTUAL AND PROCEDURAL BACKGROUND

In a previous appeal in this matter, a panel of this Court relayed the

facts in this case in an Opinion entered on October 19, 2018, as follows:

> Patricia has over twenty-two years of service as a Deputy Clerk.  From June of 1988 through December of 2002 she was employed at the Boyd County Clerk's office. Most recently, Patricia was employed as a full-time Deputy Clerk for the Carter County Fiscal Court from March 13, 2003, through November 29, 2010. During her employment, Patricia was a member of the County Employees Retirement System ("CERS"), which is administered by the Kentucky Employees Retirement System.  At the time Patricia left the Carter County Fiscal Court, she had accumulated 268 months of service credit with CERS, at least twelve months of which was current service credit.

> As a Deputy Clerk, Patricia worked 37.5 hours per week. Approximately two hours of her [workday] was spent standing or walking; the remainder of the day was spent sitting.  Patricia was responsible for customer service as well as taking inventory for her office.  Thus, while the majority of her working time was spent performing work on a computer, she was occasionally required to lift boxes weighing up to twenty pounds.

On December 28, 2010, Patricia applied for disability retirement benefits pursuant to KRS [] 61.600. In her application, Patricia listed a myriad of injuries and illnesses as the basis of her request for disability retirement: spinal compression fracture, back pain, degenerative spine disease, gastric ulcers, migraines, Meniere's disease, osteoporosis, and osteoarthritis of the lumbar spine. Patricia alleged that her back problems made it impossible to sit for more than a few hours at a time, or to stand for more than a few hours at a time. She stated that she could not sit at her computer for more than a few minutes without experiencing severe pain. While Patricia had medication for her back issues, she alleged that the medication worsened her ulcers. Additionally, Patricia alleged that the Meniere's disease caused dizziness to the point that she had difficulty seeing her computer screen, which would occasionally cause her to vomit.

Patricia indicated that she had been diagnosed with Meniere's disease in 1990, but that it had become progressively worse as she had aged. Her general back pain had worsened in February of 2009, when she fell on a patch of black ice [at her home] and fractured her vertebrae. Patricia alleged that her condition had worsened to the point that she was unable to effectively perform her job.

Eleven pages of medical records were submitted to support Patricia's application for benefits. A letter dated February 18, 2010, from Patricia's primary care physician, Dr. Malcom King, indicated that Patricia had been under his care for lumbosacral strain, cephalgia, and Meniere's disease. Dr. King stated that Patricia was unable to return to work at that time, and that the date that she would be able to return to work was unknown. For treatment, Patricia was receiving bi-weekly injections of pain medication, which interfered with her ability to drive. Additionally, the letter indicated that Patricia had recently been diagnosed with fibromyalgia by her

rheumatologist, Dr. Paul Goldfarb. A second letter from Dr. King, dated March 30, 2011, indicated that Patricia's numerous medical problems made her unable to sit or stand for more than three hours and unable to lift more than ten pounds. Dr. King stated that Patricia was in constant physical pain, which was eased only by bed rest. He stated that Patricia had undergone physical therapy and steroid injections in the spine, without improvement. Additionally, Dr. King stated that Patricia's various medications—Tramadol, Lortab, Doxepin, Valium, Antivert, Phenergan suppositories, Restoril, and bi-weekly injections of Nubain and Phenergan—prohibited her from employment and from operating a motor vehicle. Records from Dr. Wes Lewis dated February 13, 2009, indicated that Patricia had suffered a T10 compression fracture, which had caused her continued severe back pain despite conservative medical treatment. Accordingly, Patricia had had a T10 kyphoplasty done on February 11, 2009. The kyphoplasty was deemed "technically successful."

Patricia's application was reviewed by three physicians—Drs. Strunk, Patrick, and Holbrook—pursuant to KRS 61.665; each of those physicians recommended a denial of Patricia's application. Dr. Strunk found that there was no compelling evidence that Patricia's compression fracture, as treated with time to recover, would be disabling for her job. He additionally found that there was no significant documentation that Patricia's Meniere's disease, migraines, osteoporosis, or osteoarthritis would be disabling for her job. Dr. Holbrook declined to consider Patricia's peptic ulcer disease, Meniere's disease, or migraines, as he found the associated symptoms were intermittent. He concluded that Patricia's osteoarthritis would not be disabling for the mobility required for her job. Dr. Patrick simply concluded that a review of Patricia's records did not indicate that her complaints rose to the level of a permanent disability.

On June 27, 2011, Patricia received written notice that her claim for benefits had been denied. Patricia requested a formal hearing on her application for benefits on October 25, 2011. In April of 2011, Patricia had applied for Social Security disability benefits; she was approved for those benefits on March 21, 2013. The records from her Social Security application were made a part of the record in the administrative proceeding.

Records from Dr. Leon Briggs indicated that Patricia began receiving SI [sacroiliac] joint injections in May of 2009, which had given her some relief. In January of 2010, Patricia complained that her pain was worsening, and SI injections resumed in April of 2010. A memo dated May 6, 2010, indicated that Patricia felt that the SI joint injections were helping her pain; however, her pain-scale number remained relatively high. Patricia had X-rays of her thoracic, cervical, and lumbar spine done in August of 2010, following complaints of generalized spine pain. The X-ray of Patricia's thoracic spine noted the T10 vertebroplasty and identified no acute fracture. The X-ray of her cervical spine showed narrowed C5-C6 disc space, and the X-ray of her lumbar spine showed no acute or significant abnormalities. When Patricia continued to complain of severe back pain, Dr. Briggs ordered a bone scan of her entire body. The results of that scan showed some mild uptake in Patricia's extremities related to arthritic changes, but no abnormalities in her spine.

In December of 2010, Patricia again reported to Dr. Briggs with complaints of worsened back pain and associated neck pain. Dr. Briggs noted that he believed Patricia's complaints to be legitimate. While her scans showed some abnormalities, there was nothing severe. Follow ups with Dr. Briggs in April and July of 2011 indicated that Patricia continued to complain of low-back pain radiating to bilateral hips and legs. On both occasions, Dr. Briggs noted that Patricia exhibited

decreased range of motion, tenderness, bony tenderness, deformity, and pain.

Additional records from Dr. Lewis following Patricia's 2009 spinal fracture were submitted. An exam performed on February 24, 2009, indicated that Patricia had osteopenia, not osteoporosis, but was recommended for treatment consistent with osteoporosis. In July of 2009, Patricia had complained of an increase in low-back pain and bilateral leg numbness following the kyphoplasty. An MRI was done, which demonstrated mild abnormalities and changes, but nothing of significance.

A memo from Dr. Goldfarb to Dr. King documented Patricia's rheumatology consultation in February of 2011. Dr. Goldfarb noted that Patricia complained of pain along her entire spine, reaching the base of her head. The pain worsened with sitting. She had additionally complained of numbness at the top of her left leg, which occasionally occurred throughout the entire leg. Patricia reported that the pain would awaken her in the night and that it occasionally caused her to have difficulty seeing. Dr. Goldfarb expressed his belief that the pain Patricia was experiencing was "mostly involved with her fibromyalgia[,] although certainly chronic back pain with chronic compression fractures is seen." A.R. 110. Another memo from Dr. Goldfarb, dated April 6, 2011, indicated that Patricia was doing a bit better and had been able to do some aerobic exercises.

On December 1, 2011, Patricia was examined by Dr. Kathleen Monderewicz. Dr. Monderewicz reported Patricia's complaints of constant sharp pain in her spine, making it difficult to perform daily tasks. Patricia complained that she had headaches at least five times per week, which could last from one hour to days at a time. The headaches were accompanied by nausea, photophobia, and phonophobia. Dr. Monderewicz noted that Patricia had some decreased hearing in her right ear

-6-

due to the Meniere's disease, but that this did not seem to affect her ability to converse with others. Patricia's main complaint associated with the Men[ie]re's disease was the occurrence of vertigo. In reviewing Patricia's symptoms, Dr. Monderewicz noted that Patricia ambulated with an antalgic gait, but did not appear to require the assistance of a cane. She found that Patricia seemed stable and comfortable in the sitting position, but very uncomfortable in a supine position. Patricia was noted to have mild diffuse tenderness in her upper extremities, and diffuse tenderness up and down her spine. In summary, Dr. Monderewicz noted that prolonged sitting and standing, as well as walking, bending, stooping, squatting, kneeling, crawling, and lifting were limited by Patricia's chronic back pain and findings on a knee exam. She additionally found that Patricia's use of her upper extremities was limited due to pain.

A medical statement from Dr. King dated October 26, 2012, expressed his opinion that Patricia suffers from severe pain. He recommended that Patricia not work, stand less than two hours in an eight-hour day, and sit less than two hours in an eight-hour day. A medical statement from Dr. Randall James dated January 28, 2013, indicated that Patricia could work up to one hour a day, could stand less than two hours in an eight-hour day, and could sit less than two hours in an eight-hour day. Dr. James expressed his belief that Patricia was at risk of sustaining additional fractures if she returned to work.

An administrative hearing was held on November 7, 2013, at which both Patricia and her husband, John Conlin, testified about the effect Patricia's condition had on her work-life and home-life. On May 22, 2014, the hearing officer issued a recommended order denying Patricia's claim for benefits. The hearing officer determined that Patricia's job as a Deputy Clerk was best classified as light work duty under KRS 61.600(5)(c). He found that Patricia had discussed reasonable

accommodations with her employer shortly after she filed her application for disability benefits. The combination of Patricia's medications and medical restrictions of bed rest every three hours meant that there were no accommodations available to allow Patricia to continue her employment. However, the hearing officer noted that Patricia had previously been granted a reasonable accommodation in the form of a lifting restriction of no more than ten pounds. The hearing officer summarized Patricia's medical records as found in her original application for benefits and those submitted with her application for Social Security disability benefits.

The hearing officer found that Patricia was not an entirely reliable witness, as he believed her subjective claims of pain and the limitations caused by that pain were exaggerated. He found that Patricia's level of fibromyalgia pain was not supported by any of the medical records submitted for review. Additionally, the hearing officer noted that Patricia remained seated throughout the hearing without noticeable problems, frequently swung her chair from side to side, and made frequent hand gestures and head/neck movements. The hearing officer believed that these actions belied Patricia's claims of severe pain in her spine or from fibromyalgia. The hearing officer noted that no formal functional capacity testing had been submitted for consideration, and found that the objective medical records did not support the extreme limitation of functional capacity that Patricia alleged. Specifically, he noted that: Patricia testified that she did have the ability to alternate between sitting and standing at her job; in April of 2011, Patricia had told Dr. Goldfarb that she was doing some aerobic exercise and the two discussed additional aerobic exercises that Patricia could do; Patricia's kyphoplasty was considered a successful procedure; none of Patricia's X-ray or MRI scans showed any issues of such magnitude as would cause Patricia's subjective claims of pain and limitation; and Patricia was able to rotate her chair during the hearing.

-8-

The hearing officer noted that Patricia had presented evidence that she had been diagnosed with fibromyalgia, migraine headaches, Meniere's disease, and gastric ulcers; but had failed to present any objective evidence that those conditions prevented her from performing her job duties. He noted that Dr. Goldfarb had never stated that Patricia's fibromyalgia limited her ability to work. Further, he found that there had been no evidence demonstrating that any of those conditions were individually disabling. The hearing officer concluded that Patricia's subjective claims of pain were unsupported, and that she had failed to show that she suffered a permanent disability from the cumulative effects of her medical conditions.

Patricia filed exceptions to the hearing officer's recommended order on June 6, 2014; however, the Board entered a final order adopting the hearing officer's recommended order on July 29, 2014. Patricia appealed to the Franklin Circuit Court, which affirmed by order entered July 28, 2017. The circuit court noted that none of the providers who treated Patricia had indicated that her conditions made her mentally or physically incapacitated on a permanent basis. While Patricia had been taken off work for a brief period following her fall in 2009, the record indicated that she had returned to work following a successful treatment. Further, the circuit court found that the record indicated that Patricia had been responding well to her additional treatments for her degenerative disc disorder and for her compression fracture. Accordingly, the circuit court found that the Board's final order was supported by substantial evidence.

The circuit court additionally concluded that the Board had properly considered the cumulative effect Patricia's conditions had on her ability to perform her job. The circuit court noted Patricia's claim that the hearing officer had completely ignored her primary care

physician's opinions. The circuit court found that this could not be grounds for overturning the Board's decision, as the hearing officer is not entitled to give more weight to a primary care physician's opinion during a disability determination.

*Conlin v. Board of Trustees of Kentucky Retirement Systems*, No. 2017-CA-001348-MR, 2018 WL 5099635, at *1–4 (Ky. App. Oct. 19, 2018).[1]

Patricia appealed the circuit court's decision to this Court, which reversed and remanded the case to the Board, finding that "[t]he opinion and conclusions of a treating physician must be considered objective medical evidence for purposes of KRS 61.600." *Id*. at *5 (quoting *Kentucky Ret. Sys. v. Lowe*, 343 S.W.3d 642, 647 (Ky. App. 2011)). Therefore, "to the extent that the Board completely disregarded the opinions and conclusions of Patricia's treating physicians because they were based on Patricia's subjective claims of pain, it acted in contravention of statute." *Id*. Thus, the Court of Appeals concluded that, "[t]o the extent that the hearing officer and the Board failed to consider the effect all of her conditions, considered together, had on Patricia's 'residual functional capacity and physical exertion requirements' it is instructed to do so on remand." *Id*. at *6 (citing KRS 61.600(5)(a)(2)). This Court further stated, "[o]n remand, all objective medical evidence, including the opinions and reports of Patricia's treating physician, shall be taken into consideration [and analyzed]." *Id*.

---

[1] We cite this case pursuant to Kentucky Rule of Appellate Procedure ("RAP") 41.

The Board remanded the case with instructions to issue a recommended order on remand consistent with the opinion of the Court. *Id.* A new Hearing Officer was assigned to preside over the case, and the parties agreed that there was no need for a supplemental hearing or additional briefing. The Hearing Officer issued a recommended order on remand, again recommending denial of Patricia's application for disability retirement benefits. The Board adopted this order with minor corrections. Patricia again appealed to the circuit court, which reversed the decision of the Board and ordered that Patricia be granted disability retirement benefits. This appeal followed.

We will discuss further facts as they become relevant.

## ANALYSIS

### 1. Standard of Review

A reviewing court must first determine whether KPPA's final order was supported by substantial evidence. *Kentucky Retirement Systems v. Ashcraft*, 559 S.W.3d 812, 819 (Ky. 2018). "The test of substantiality of evidence is whether when taken alone or in the light of all of the evidence it has sufficient probative value to induce conviction in the minds of reasonable men." *Kentucky State Racing Commission v. Fuller*, 481 S.W.2d 298, 308 (Ky. 1972) (citation omitted). If KPPA's final order is supported by substantial evidence, the reviewing court must determine "whether the evidence in that party's favor is so

compelling that no reasonable person could have failed to be persuaded by it." *Ashcraft*, 559 S.W.3d at 816 (citation omitted).

As stated by a panel of this Court, "[t]he circuit court's role as an appellate court is to review the administrative decision, not to reinterpret or to reconsider the merits of the claim, nor to substitute its judgment for that of the agency as to the weight of the evidence." *500 Associates, Inc. v. Natural Resources and Environmental Protection Cabinet*, 204 S.W.3d 121, 131 (Ky. App. 2006) (footnote citations omitted). "The rule in Kentucky is that if there is substantial evidence in the record to support an agency's findings, the findings will be upheld, even though there may be conflicting evidence in the record." *Kentucky Commission on Human Rights v. Fraser*, 625 S.W.2d 852, 856 (Ky. 1981) (citations omitted). Indeed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Fuller*, 481 S.W.2d at 307 (citations omitted). Moreover, "[i]n weighing the substantiality of the evidence supporting an agency's decision, a reviewing court must hold fast to the guiding principle that the trier of facts is afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses appearing before it." *Bowling v. Natural Resources and Environmental Protection Cabinet*, 891 S.W.2d 406, 409–10 (Ky. App. 1994) (citation omitted). "To put it simply, the trier of facts in an

administrative agency may consider all of the evidence and choose the evidence that he believes." *Id*. at 410 (internal quotation marks and citation omitted).

## 2. **Discussion**

On appeal, KPPA argues that the circuit court erred by: 1) exceeding the bounds of judicial review under KRS Chapter 13B; 2) failing to properly apply the two-pronged test of judicial review established by Kentucky caselaw; 3) failing to properly analyze the cumulative effect of Patricia's conditions; and 4) shifting the burden of proof to KPPA. We will address each argument *seriatim*.

Exceeding the Bounds of Judicial Review

In KPPA's first argument, KPPA specifically alleges that the circuit court failed to analyze the recommended order on remand, improperly giving more weight to Patricia's treating physicians, overturning KPPA's credibility findings, re-examining the evidence, and neglecting to give KPPA the deference it was owed.

KRS Chapter 13B governs administrative hearings before state agencies such as the KPPA. We begin by noting that, in administrative proceedings, the claimant "has the burden to show the propriety of the agency action or entitlement to the benefit sought." KRS 13B.090(7). Moreover, "[t]he ultimate burden of persuasion in all administrative hearings is met by a

preponderance of evidence in the record[.]" KRS 13B.090(7); *see also Kentucky Retirement Systems v. West*, 413 S.W.3d 578, 581 (Ky. 2013).

Specifically, the statutory framework requires a determination, based "[u]pon the examination of the objective medical evidence by licensed physicians[,]" as to whether "[t]he person, since his last day of paid employment, has been mentally or physically incapacitated to perform the job, or jobs of like duties, from which he received his last paid employment." KRS 61.600(3)(a). Moreover, the objective medical evidence must show that "[t]he incapacity is deemed to be permanent[.]" KRS 61.600(3)(c). An incapacity is deemed permanent "if it . . . can be expected to last for a continuous period of not less than twelve (12) months from the person's last day of paid employment in a regular full-time position." KRS 61.600(5)(a)1. A determination of permanency must be "based on the medical evidence contained in the member's file and the member's residual functional capacity and physical exertion requirements[,]" meaning "the person's capacity for work activity on a regular and continuing basis." KRS 61.600(5)(a)2. and KRS 61.600(5)(b).

As noted by the Kentucky Supreme Court, when an appellate court is analyzing an agency's decision regarding entitlement to benefits, the court must conduct "a two-step approach by first considering whether the . . . final order [is] properly supported by substantial evidence[.]" *Ashcraft*, 559 S.W.3d at 819 (citing

-14-

KRS 61.665(3)(d)).  *See also Bradley v. Kentucky Retirement Systems*, 567 S.W.3d

114, 119 (Ky. 2018) ("As explained more fully in *Ashcraft*, even where the

applicant loses before the Board, it is appropriate on judicial review for the courts,

at every level, to first consider whether the denial is supported by substantial

evidence.").  However,

> [i]n cases such as this where the evidence may, at least at
> first blush, be perceived to be in equipoise, the . . .
> "compelling evidence" standard properly breaks the tie.
> It does so by implementing the legislative command that
> the courts "not substitute [their] judgment for that of the
> agency as to the weight of the evidence on questions of
> fact," KRS 13B.150(2), while outlining an
> understandable test for determining if the [factfinder] was
> "arbitrary, capricious or . . . abuse[d] [its] discretion" in
> violation of KRS 13B.150(2)(d) when assessing the
> evidence.

*Bradley*, 567 S.W.3d at 120.

In this case, the circuit court stated "[KPPA's] rejection of the reports

of the treating physicians without any contrary medical evaluation from any other

examining physician, supports a finding that *there is no substantial evidence in the*

*record to support [KPPA's] denial*."  (Emphasis added.)  The circuit court further

stated that KPPA "improperly disregarded the objective medical evidence from

[Patricia's] treating physicians.  As a result, its decision to deny was *not supported*

*by substantial evidence*."  (Emphasis added.)  We disagree with the circuit court's

conclusions that KPPA "disregarded" evidence from Patricia's treating physicians

and that no substantial evidence in the record supported KPPA's denial of Patricia's claim.

We find the Kentucky Supreme Court's decision in *Bradley* to be similar to the case *sub judice*. 567 S.W.3d at 115. In *Bradley*, the Kentucky Supreme Court found that KPPA properly declined to give greater weight to physician reports not supported by objective medical testing, stating:

> Ultimately, the Board denied Bradley's application for failure to prove by a preponderance of the evidence that she was entitled to disability retirement. Having considered the record, including the two reports from the hearing officer, we can say with confidence that the Board's decision in this case is supported by substantial evidence. KRS 61.665(3)(d). The circuit court found otherwise, agreeing with Bradley that "the Board improperly stepped into the shoes of [her] doctors, reevaluating the medical records and reports without the proper expertise to do so." To the contrary, the Board examined the "whole record" (as required by KRS 61.665(3)(d)) closely, and consistent with *Kentucky Retirement Systems v. Bowens*, 281 S.W.3d 776 (Ky. 2009), ***declined to give greater weight to Bradley's primary treating physicians on the Lyme disease diagnosis ... because neither had objective lab testing substantiating the diagnosis and relied heavily, if not exclusively, on Bradley's self-reporting of symptoms***. The Board detailed the objective medical evidence of record supportive of its conclusion that Bradley is not permanently disabled under the KERS statutes. ***The Board is the [factfinder] in these matters and it did its job in this case consistent with the statutory standard***.

*Id*. at 124 (emphasis added). Consequently, pursuant to *Bradley*, the KPPA may weigh the objective medical evidence and give greater weight to its own doctors'

opinions if Patricia's doctors' opinions do not have "objective . . . testing substantiating the diagnosis and [rely] heavily, if not exclusively, on [Patricia's] self-reporting of symptoms." *Id*. at 124.

KPPA's final order on remand from this Court's first decision, conforms with the foregoing analysis required by the Kentucky Supreme Court in *Bradley*. Patricia provided her physicians' reports, which lacked objective testing to bolster their conclusions. KPPA, in its role as factfinder, declined to accord greater weight to these reports. Indeed, the Hearing Officer thoroughly evaluated Patricia's treating physicians' opinions on remand in conjunction with the objective medical evidence in the overall record and detailed his explanation for giving them less weight:

> Dr. King was [Patricia's] primary care physician for 40 years and is currently her only physician. [Patricia] testified Dr. King took her off work in December 2010 due to weekly and biweekly visits. . . . [Patricia] testified that prior to Dr. King taking her off work she was able to accomplish all the tasks of her position. [Patricia] testified that her back condition was 95% of the reason she could not perform her job duties due to lifting and turning. In November 2010, Dr. King restricted [Patricia] to the ten-pound weight limit and a two-hour siting [sic] restriction for an eight-hour workday. [Patricia] was treated with muscle relaxants and bed rest. In December 2010, Dr. King diagnosed [Patricia] with intractable back pain, Meniere's disease, gastric ulcer and migraine headaches[.] Dr. King opined [Patricia] had severe limitations of functional capacity and she was unable to even do sedentary work. Dr. King opined that he did not know when [Patricia] could [return to work]

-17-

and would reevaluate after one month.  Dr. King did not explain his conclusions.  ***The burden of proof is upon [Patricia] and the Systems is not required to disprove the application***.

In January 2010, Dr. Briggs, Pain Interventionist noted improvement in SI injections from May 2009.  Treated with SI injections and PT.  In May 2010, Dr. Briggs noted overall improvement.  An MRI and X-ray in August 2010 showed no acute or significant abnormalities with disc spaces well maintained.  The cervical, thoracic and lumbar MRI's showed minor findings and [Patricia] complained of significant pain throughout the areas.  A whole-body scan in September 2010 showed no significant findings other than minimal degenerative changes.  In December 2010, [Patricia] complained of pain throughout cervical, thoracic and lumbar spine.  Dr. Briggs believed the pain was legitimate despite the scans showing abnormalities but nothing severe.  Dr. Briggs did not explain his opinion.  This is the month that Dr. King took [Patricia] off work.  ***Based upon the weight restriction, sedentary work, and objective testing that showed only minor findings and minimal degenerative changes, there was no objective basis for [Patricia] to be taken off work***.

In April 2011, [Patricia] reported lower back pain at 8/10. Lumbar examination showed decreased ROM, tenderness and pain and neurological examination showed normal strength.  In July 2011, [Patricia] reported low back pain radiating into bilateral hips and legs.  In December 2011, [Patricia] was evaluated by Dr. Monderewicz and Dr. Beihn.  Dr. Beihn restricted [Patricia] to ten-pounds occasionally and frequently less than ten pounds; limited to sit for six hours in an eight-hour workday; and limited to stand/walk for two hours during an eight-hour workday.  These restrictions did not exceed [Patricia]'s job requirements.

In October 2012, Dr. King opined [Patricia] suffered from severe pain and could not work for any length of time per day, limited walk/stand/sit to less than two hours per day for each, and weight limit of five pounds. [Patricia] had been off work for approximately two years when he rendered this opinion and increased the restrictions.

(Emphasis added) (citations omitted throughout).

Despite the final order's comprehensive analysis of Patricia's treating physicians' opinions, the circuit court determined that KPPA rejected the opinions of Patricia's treating physician solely because they were not based upon objective medical evidence. No such finding exists in the final order on remand. Rather, the order made the following finding:

> ***The following medical opinions from the treating physicians have been considered***. On December 23, 2010, Dr. King opined [Patricia] had severe limitation of functional capacity and was incapable of even sedentary work. The 2010 objective testing showed well-spaced discs, and no acute or significant abnormality. ***Dr. King did not perform any testing or justify why he accepted subjective allegations of pain over the objective testing. The objective testing was more credible objective medical evidence***.
>
> Dr. Briggs in August 2010, also departed from the objective testing. He ordered a whole-body scan which showed only minimal degenerative changes. [Patricia] alleged significant pain in the cervical, thoracic and lumbar areas, the same areas which the testing showed only minor findings.
>
> . . .

-19-

The 2012 MRI[]s showed no acute fractures or canal stenosis, no evidence of neural impingement, no focal disc herniation, canal stenosis or neural foraminal stenosis. X-rays showed negative with no change in alignment with flexion or extension and mild DDD.

. . .

[Patricia's] [last day of paid employment] was November 29, 2010. The opinions thereafter varied more and more from the objective testing. While [Patricia's] subjective allegations of pain were accepted by the treating physicians, the objective testing was simply more credible. The treating physicians did not explain their opinions or variance from the very testing they ordered.

(Emphasis added.) Thus, the Board did not simply discard Patricia's treating physicians' reports as failing to meet the objective medical evidence standard. Rather, the Board found that these opinions failed to substantiate Patricia's burden of persuasion:

[Patricia] testified the back and Meniere's conditions affected her walking, ambulation and ability to sit and walk for long distances. ***The job requirements did not require this physical effort and the restrictions from Dr. King, Dr. James, Dr. Lewis and the [residual functional capacity ("RFC")] more than covered this issue at the time of the [last date of paid employment]***. [Patricia] testified the employer was aware of the restrictions after she [returned to work] and they did not prevent her from performing her job duties. ***[Patricia] testified that she did not abide by the weight restriction upon [return to work]***. The main symptoms as discussed were vertigo and dizziness. [Patricia] reported the dizziness prevented her from using the computer and caused vomiting. This was not reported by any of the treating physicians or examining physicians. [Patricia] was able to speak and

-20-

hear clearly, follow simple instructions in her position, and was not required to sit, stand or walk for extended periods and had the ability to alternate. Employer informally allowed breaks and allowed [Patricia] to rest her head at her desk or in the kitchen. ***The condition was longstanding and there is no evidence of record or specific treating physician opinion that this condition combined with any other conditions to cause a permanent disability***. Dr. King opined [Patricia] was unable to work due to the oral medications. This hearing officer was unable to find a medical opinion that specifically stated the Meniere's disease was made worse by the back condition and the specific medication prescribed for [Patricia]'s back. The positional vertigo and back conditions did not individually permanently disable [Patricia]. The medications prescribed for [Patricia]'s back were pain medications and for insomnia and the medications for Meniere's disease were for anxiety, salt pills and dizziness. All of [Patricia's] listed medications were prescribed by Dr. King. The medications should have been prescribed with the other conditions in mind. There was no medical opinion of record concerning the back medication making the Meniere's disease worse. . . . Dr. King made numerous conclusions but did not explain any of his opinions. He would have been the best physician to have described why the subjective complaints of pain outweighed the contrary objective testing. A simple statement of disability is insufficient proof.

(Emphasis added.)

Despite this detailed analysis, the circuit court held that KPPA's final order did not contain any convincing reasoning that supported rejecting the opinions of Patricia's treating physicians. However, as in *Bradley*, KPPA was presented with multiple physicians' reports, which lacked objective testing to

-21-

support their findings. KPPA, in its role as finder of fact, chose not to grant greater weight to these reports, and it was free to do so under the existing statutory framework.

Indeed, the circuit court may not instruct KPPA what weight to assign evidence, as "[i]t is the exclusive province of the administrative trier of fact to pass upon the credibility of witnesses, and the weight of the evidence." *500 Associates, Inc*, 204 S.W.3d at 132 (citation omitted). Rather, KPPA retained the discretion to determine that Patricia's treating physicians' reports and Patricia's own testimony were less reliable than the other evidence and should consequently be given less weight. The Hearing Officer's justification for this decision is well-founded and described as follows:

> The objective testing during August 2010 and December 2010 did not show significant findings or support for Dr. King's opinion. Dr. King did not note any testing or reason to ignore objective testing. ***The objective medical evidence in the form of Dr. King's opinion based solely upon [Patricia]'s subjective complaints and contrary to the objective testing and without further explanation is not as credible as the objective testing***.

(Emphasis added.) While the circuit court may have reached a different result, it may not supplant the Board's judgment.

The circuit court also found that KPPA's determination that Patricia was not permanently incapacitated was not supported by substantial evidence based on a letter drafted by Patricia and signed by her former employer stating that

-22-

there was no work available to Patricia that she was not medically restricted from executing.  However, the Hearing Officer analyzed the letter and determined that it held minimal evidentiary significance, stating:

> A [to whom it may concern] letter dated January 10, 2011[,] was drafted by [Patricia] and signed by [Patricia] and employer stating there was no available position that she could work.  This letter was in the form of a request for accommodation and stated the employer could not accommodate her.  The letter was dated two years post-surgery and her authorized [return to work], two months post [last day of paid employment] and last date of actual work, and two weeks after she filed an application for disability benefits.  [Patricia] wrote and signed the letter without any intent on continuing to work as accommodated as she had already stopped working.  [Patricia] testified that the employer was aware of the weight limit and the restrictions did not prevent her from working.  [Patricia] was not consistent with the weight limits as restricted and accommodated.

Again, we note that KPPA, as factfinder, had the unique discretion under the statutory language to determine the appropriate weight and significance to afford this evidence.  *See Kentucky Public Pensions Authority v. Swint*, 714 S.W.3d 398, 408 (Ky. App. 2025).

<u>Two-pronged Test of Judicial Review</u>

KPPA next argues that the circuit court failed to properly apply the two-pronged test of judicial review mandated by this Court in *McManus v. Kentucky Retirement Systems*, 124 S.W.3d 454, 458–59 (Ky. App. 2003).  We agree.  We have before us a case where the record can fairly be read as containing

-23-

substantial evidence in favor of both sides. As a result—and as already discussed—the circuit court should have only reversed if the evidence so overwhelmingly favored Patricia that it compelled a contrary conclusion. Because the final order was supported by substantial evidence it may only be disturbed if Patricia presented evidence that was "so overwhelming," upon consideration of the entire record, that it compelled a finding in her favor. *McManus*, 124 S.W.3d at 459. KPPA's denial can be deemed unreasonable only if Patricia proved her case to such a degree that it can be said that there was no room for reasonable minds to differ and "compelled a ruling in [her] favor." *Ashcraft*, 559 S.W.3d at 819.

> As discussed by the Kentucky Supreme Court:
>
> > [p]reponderance of the evidence is the applicant's burden of proof before the hearing officer and Board, while the "compelling evidence" standard in *McManus* is a *judicial* standard of review applied by the court after the administrative process has concluded. As noted repeatedly, it is a high standard because of the deference owed the administrative [factfinder]. If courts re-applied the preponderance of the evidence standard, they would be assessing the evidence and weighing it *de novo*, in direct violation of KRS 13B.150(2)'s directive that courts "shall not" substitute their judgment for the [factfinder] on issues of fact.

*Bradley*, 567 S.W.3d at 120 (emphasis in original).

Here, the circuit court stated, "the evidence is compelling that [Patricia] has satisfied her burden to prove disability under the statute." We disagree with this conclusion. Patricia did not present evidence so compelling that

no reasonable person could fail to be persuaded. Patricia's application for benefits was evaluated and rejected by three different medical examiners employed pursuant to KRS 61.665, the Board, two separate Hearing Officers, and the circuit court in the first appeal. Thus, there are abundant examples of reasonable minds differing. Patricia failed to prove that the evidence in her favor was "so compelling that no reasonable person could have failed to be persuaded by it." *Kentucky Retirement Systems v. Brown*, 336 S.W.3d 8, 14–15 (Ky. 2011) (quoting *McManus*, 124 S.W.3d at 458).

<u>Cumulative Effect Analysis</u>

KPPA next argues that the circuit court failed to properly analyze the cumulative effect of Patricia's conditions. The Hearing Officer's findings in this regard complied with this Court's instructions on remand, stating:

> The Meniere's condition did not result in a permanent disability individually or contribute cumulatively with other conditions. The condition was diagnosed, confirmed by testing, resulted in two operations and was treated with medications. The main symptom was vertigo. The condition was longstanding as [Patricia] worked for twenty years with the condition. [Patricia] alleged the condition worsened after the 2009 fall but this was not confirmed by the record. In 2011, Dr. Monderewicz and Dr. Beihn found the condition to be positional Vertigo. Dr. Monderewicz's examination showed normal tandem gait and the only restriction for the condition was to avoid heights. [Patricia] testified the <u>back and Meniere's</u> conditions affected her walking, ambulation and ability to sit and walk for long distances. The job requirements did not require this physical effort

-25-

and the restrictions from Dr. King, Dr. James, Dr. Lewis and the RFC more than covered this issue at the time of the [last day of paid employment]. [Patricia] testified the employer was aware of the restrictions after she [returned to work] and they did not prevent her from performing her job duties. [Patricia] testified that she did not abide by the weight restriction upon [return to work]. The main symptoms as discussed were vertigo and dizziness. [Patricia] reported the dizziness prevented her from using the computer and caused vomiting. This was not reported by any of the treating physicians or examining physicians. [Patricia] was able to speak and hear clearly, follow simple instructions in her position, and was not required to sit, stand or walk for extended periods and had the ability to alternate. Employer informally allowed breaks and allowed [Patricia] to rest her head at her desk or in the kitchen. The condition was longstanding and there is no evidence of record or specific treating physician opinion that this condition combined with any other conditions to cause a permanent disability. Dr. King opined [Patricia] was unable to work due to the oral medications. . . . This hearing officer was unable to find a medical opinion that specifically stated the Meniere's disease was made worse by the back condition and the specific medication prescribed for [Patricia]'s back. The positional vertigo and back conditions did not individually permanently disable [Patricia]. The medications prescribed for [Patricia]'s back were pain medications and for insomnia and the medications for Meniere's disease were for anxiety, salt pills and dizziness. All of [Patricia]'s listed medications were prescribed by Dr. King. The medications should have been prescribed with the other conditions in mind. There was no medical opinion of record concerning the back medication making the Meniere's disease worse. Dr. King was the [primary care provider] for 40 years and was the sole prescriber of the listed medications. Dr. King made numerous conclusions but did not explain any of his opinions. He would have been the best physician to have described why the subjective complaints of pain

outweighed the contrary objective testing. A simple statement of disability is insufficient proof.

Th[e] gastric and migraine headaches condition did not result in a permanent disability individually or contribute cumulatively with other conditions. The gastric condition was treated with medications. The objective testing showed simple inflammation of the stomach lining of the type that did not cause ulcers. The 2009 Duodenal ulcer was never rescoped and condition was unknown. There was no objective medical evidence at time of [last date of paid employment] or 12 months since to show the status of the condition. There was no medical opinion of disability concerning the gastric condition or that it affected her job performance.

. . .

The migraine headaches were diagnosed ten years ago and [Patricia] alleged they worsened after the 2009 fall. The condition was treated with Phenergan and injections. [Patricia] reported an increase in severity in 2011 to Dr. Monderewicz but did not testify to the increase in November 2013. Dr. Monderewicz opined the headaches were a mixed type with some migrainous components as well as tension type from cervical strain. The headaches did not cause cervical strain or nausea. In February 2011, Dr. Goldfarb noted no recent headaches, dizziness, vision changes, or hearing changes. This was two months post [last date of paid employment].

Th[e] fibromyalgia condition did not result in a permanent disability individually or contribute cumulatively with other conditions. The condition was diagnosed in February 2011. The condition was treated with the same medications prescribed for her back condition. [Patricia] testified to constant pain and that she was always exhausted. The objective testing showed only minor findings in the cervical, thoracic and lumbar areas. [Patricia] complained of significant pain

-27-

throughout the areas tested. [Patricia]'s allegations were not consistent with the objective findings. . . . In February 2011, Dr. Goldfarb recognized the pain and believed that fibromyalgia was mostly responsible but added the presence of chronic back pain and chronic compression fractures. Dr. Goldfarb ordered objective testing and then ignore[d] the results based upon the subjective allegations of the patient and without any explanation. . . . In April 2011, [Patricia] reported doing well with aerobic exercises and climbing steps. Dr. Goldfarb recommended other forms of exercise in lieu of the steps. Dr. Goldfarb did not opine [Patricia] was unable to perform her job duties. Dr. Monderewicz opined the condition affected reaching with upper extremities and [weakened] grips but normal bilateral fine manipulation.

Th[e] back condition did not result in a permanent disability individually or contribute cumulatively with other conditions. [Patricia] fell in February 2009, had successful surgery and [returned to work]. She was given a ten-pound weight limit which did not prevent her from performing her job duties. In November 2010, Dr. King restricted [Patricia] to two-hour sitting during an eight-hour work day and maintained the ten-pound limit. This additional restriction did not prevent [Patricia] from performing her work duties. [Patricia] was taken off work in December 2010 due to [Patricia]'s weekly and biweekly office visits to Dr. King. [Patricia] testified that this condition was 95% of the reason she could not perform her job duties. Dr. King opined [Patricia] had severe limitation of functional capacity and was unable to even do sedentary work. The objective testing during August 2010 through December 2010 did not show significant findings or support for Dr. King[']s disability opinion. Dr. King did not note any testing or reason to ignore the objective testing. The objective medical evidence in the form of Dr. King's opinion based solely upon [Patricia]'s subjective complaints and contrary to the objective testing and without further explanation is

not as credible as the objective testing. Dr. Briggs Pain Interventionist also ignored the objective testing in lieu of [Patricia]'s allegations of pain. The objective testing only showed minimal degenerative changes. Dr. Briggs opined [Patricia] showed overall improvement in May 2010 and the objective testing was confirmed. [Patricia]'s subjective complaints were contrary to the objective testing. Objective testing showed [Patricia] had osteopenia and not osteoporosis. The testing further showed normal bones other than minimal degenerative changes. This relieves the concern of Dr. James concerning future risk of fractures with continued work. [Patricia] testified that her back condition was worse than in 2010 when she was taken off work due to Osteoarthritis and DDD. The diagnosis and disability had to exist at the date of the [last day of paid employment]. [Patricia] alleged the back and Meniere's condition affected her walking and ambulation and is discussed under Meniere's disease. The back and fibro conditions were treated with the same medication. The back medication allegedly made the ulcers worse which caused nausea and made the headaches worse. The ulcers and migraines were medically treatable and not a permanent disability.

Despite this comprehensive examination of the evidence supporting the KPPA's ultimate determination regarding the cumulative effect of Patricia's various ailments, the circuit court concluded that the Board had not supported its decision with objective medical evidence. However, upon remand, the final order's language as recited above illustrates that KPPA evaluated the entire record and studied all of Patricia's evidence, including her testimony and Dr. King's opinion. KPPA discussed the evidentiary value of Dr. Monderewicz's opinions, Patricia's imaging studies results, and the RFC conducted by the Social Security

Administration, and gave them greater weight because the restrictions suggested by Dr. King post-dated Patricia's last date of paid employment by over two years. KPPA determined that Patricia had not proven by a preponderance of the evidence that the incapacity generated by the cumulative effect of her conditions, as determined by Dr. King, was present as of her last date of paid employment. This finding was supported by substantial evidence, and Patricia failed to produce evidence that compelled a different result.

Shifting the Burden of Proof to KPPA

Finally, KPPA argues that the circuit court erred in shifting the burden of proof to KPPA. As previously discussed, KRS 13B.090(7) mandates that *Patricia*—not KPPA—prove her "entitlement to the benefit sought." In this case, the circuit court improperly shifted this burden when it stated that KPPA was required to rebut Patricia's treating physicians' opinions by providing evidence such as "a contrary medical evaluation from any other examining physician" or "medical testimony to the contrary." Indeed, as discussed by the Court in *West*, KPPA "does not bear the burden of proof and may choose not to challenge evidence it deems unconvincing. The sufficiency of the claimant's showing is not wholly calculated by whether or not [KPPA] presents evidence in rebuttal." *West*, 413 S.W.3d at 581. In this case, the circuit court's requirement that KPPA present

evidence to refute or disprove Patricia's evidence improperly shifted the statutorily required burden of proof.

## <u>CONCLUSION</u>

For the foregoing reasons, we reverse the Franklin Circuit Court's order and remand for an order consistent with this Opinion.

EASTON, JUDGE, CONCURS.

TAYLOR, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

Jessica K. Buck
Frankfort, Kentucky

BRIEF FOR APPELLEE:

M. Kevin Lett
Ashland, Kentucky